UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

NICHOLAS THRASH,

    Plaintiff,

    v.                                  CAUSE NO. 3:19-CV-200-RLM-MGG

TRACY SULLIVAN,

    Defendant.

OPINION AND ORDER

Nicholas Thrash, a prisoner proceeding without a lawyer, was granted leave to proceed on a Fourteenth Amendment claim against Nurse Tracy Sullivan "in her personal capacity for money damages for denying him necessary medical care for a cyst on his testicle from September 2017 to February 2018" while he was a pretrial detainee at the Grant County Jail. Nurse Sullivan moves for summary judgment in her favor, and the motion is ripe for ruling.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018). In deciding whether a genuine dispute of fact exists, the court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all

reasonable inferences from that evidence in favor of the party opposing summary judgment." Dunn v. Menard, Inc., 880 F.3d 899, 905 (7th Cir. 2018) (citation omitted).

A party opposing a properly supported summary judgment motion can't just rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." Trade Fin. Partners, LLC v. AAR Corp., 573 F.3d 401, 407 (7th Cir. 2009). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). At the summary judgment stage, the court cannot "weigh conflicting evidence" or "make credibility determinations," because that's the jury's job. Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704-05 (7th Cir. 2011) (citations omitted). The court's only job on a summary judgment motion is "to determine whether there is a genuine issue for trial." Tolan v. Cotton, 572 U.S. 650, 657 (2014).

The undisputed facts reflect that Mr. Thrash is 39 years old and is serving a criminal sentence within the Indiana Department of Correction. During 2017 and 2018, he was held at the Grant County Jail as a pretrial detainee. He first arrived at the jail sometime in May 2017. Jail medical records reflect that a nurse at the jail (a non-party) saw him on September 1, 2017, when he complained that he needed mental health treatment and dental care. Mr. Thrash also reported that he had a

2

lump and pain in his groin area. The nurse contacted the jail's medical provider, Nurse Practitioner Kelly Carroll, who entered orders for amoxicillin and ibuprofen and instructions that Mr. Thrash be placed on the list to see the dentist.

Unless otherwise noted, all pertinent events occurred in 2017. Nurse Sullivan saw Mr. Thrash at sick call on September 19, and he reported soreness in his left ear and a lump in his groin area that had been there for about a month. She took his vital signs and physically examined his genitals.[1] She noted there was some slight swelling on his right testicle, but she didn't feel the "third ball" Mr. Thrash had described it to her. While trying to complete her assessment, she felt that "Mr. Thrash kept trying to get [her] to feel more of his testicles." She felt "uncomfortable," as she suspected his requests might be "sexually motivated." Mr. Thrash, in turn, says it was Nurse Sullivan who was making an "uncomfortable environment" by accusing him of "attempting to get her to feel [him] up." Nurse Sullivan didn't observe any significant abnormality. She relayed Mr. Thrash's symptoms to Nurse Practitioner Carroll, who declined to order any specific treatment but instructed that Mr. Thrash should submit a request for health care if he experienced any new or worsening symptoms.

A different nurse (a non-party) assessed Mr. Thrash on September 21, for complaints of swelling on his testicle and inability to urinate. Mr. Thrash was told that medical staff would catheterize him if necessary; he then went to the bathroom and was able to urinate. A urinalysis showed no abnormalities. The nurse relayed

---

[1] She also examined his ear and thought he might have a pimple in an ear canal.

3

Mr. Thrash's symptoms to Nurse Practitioner Carroll, who said the nurse that he should increase his water intake, rest and follow up with medical staff if the condition worsened or persisted. Mr. Thrash was told that he could use commissary products for pain as needed.

Another nurse (a non-party) saw Mr. Thrash on September 23, when he again complained about difficulty urinating and pain in his testicle. The nurse noted a "small raised area" that appeared to follow a vein on his testicle and sent pictures of the affected area to Nurse Practitioner Carroll, who didn't think they showed any significant abnormality. Nurse Practitioner Carroll sent word that Mr. Thrash could discuss the issue at his next visit with her.

On September 26, Nurse Sullivan saw Mr. Thrash at sick call. He reported continued pain in his testicle and asked for pain medication. Nurse Sullivan noted that despite his complaints of extreme pain he had walked into the medical unit without difficulty. She took his vital signs and noted that pictures of the affected area had previously been sent to Nurse Practitioner Carroll. (*Id.*) Nurse Sullivan relayed Mr. Thrash's symptoms to Nurse Practitioner Carroll, who said she would see him at her next facility visit. Nurse Practitioner Carroll saw and evaluated Mr. Thrash the next day, and ordered an ultrasound of his testicles.

Mr. Thrash underwent a testicular ultrasound on October 2, 2017. The radiologist's report noted "no abnormal solid mass, no hernia, varicocele, or

4

spermatocele."[2] (*Id.*) The report concluded that Mr. Thrash had "normal bilateral testes" with "a small bilateral hydroceles" and small right "simple cyst."[3] (*Id.*) Nurse Sullivan relayed the ultrasound results to Mr. Thrash the next day. She told him that the results would be forwarded to Nurse Practitioner Carroll to determine if any treatment was necessary. Nurse Practitioner Carroll decided on October 5 that no treatment was needed at that time.

Nurse Sullivan saw Mr. Thrash again at the October 11 sick call and he asked for medication for testicular pain. Nurse Practitioner Carroll again said Mr. Thrash could buy over-the-counter pain medication through the commissary as needed. Nurse Sullivan saw Mr. Thrash reported worsening pain when Nurse Sullivan saw him again on October 17. He asked for pain medication and to go to the hospital. Nurse Sullivan felt no bump when she physically palpated his testicles. She contacted Nurse Practitioner Carroll, who stated she would review his chart at her next facility visit, which turned out to be October 22. Nurse Practitioner Carroll reviewed Mr.

---

[2] "Varicocele" refers to an "enlargement of the veins of the spermatic cord." TABER'S MED. DICTIONARY, avail. at https://www.tabers.com/tabersonline/view/Tabers-Dictionary/764830/all/varicocele (last visited Aug. 23, 2022). A "spermatocele" is a "cystic tumor of the epididymis containing spermatozoa." *Id.*, avail. At https://www.tabers.com/tabersonline/view/Tabers-Dictionary/769825/all/spermatocele (last visited Aug. 23, 2022).

[3] A "hydrocele" is "[t]he accumulation of serous fluid in a saclike cavity." TABER'S MED. DICTIONARY, avail. at https://www.tabers.com/tabersonline/view/Tabers-Dictionary/734180/all/hydrocele?q=hydroceles#10 (last visited Aug. 23, 2022). Likewise, a cyst is "a closed sac or pouch with a definite wall, containing fluid, semifluid, or solid material." *Id.*, avail at https://www.tabers.com/tabersonline/view/Tabers-Dictionary/764299/all/cyst?q=cyst (last visited Aug. 23, 2022).

Thrash's medical records and again determined that no treatment of the testicular issue was indicated at that time.

Nurse Sullivan saw Mr. Thrash at sick call on October 25. Mr. Thrash was complaining of pain in his testicle. Nurse Sullivan took his vital signs and palpated his testicle, noting a "small pea-sized cyst" on the top of the right testicle that was not visible to the eye. The next day, Nurse Sullivan notified Nurse Practitioner Carroll of Mr. Thrash's symptoms, and Nurse Practitioner Carroll reviewed his chart again and found "no need for further treatment." Nurse Practitioner Carroll questioned whether he might be continuing to complain about pain in his testicle "in order to have female nurse[s] examine his genitals," and directed nursing staff not to physically palpate his genitals at sick call until Nurse Practitioner Carroll saw him at her next facility visit.

Nurse Practitioner Carroll saw Mr. Thrash on November 7. She again explained the ultrasound results to him, noting that he had a "simple cyst" for which treatment wasn't medically necessary in her view. She also told him that the nurses would no longer be physically palpating his genitals at sick call. Nurse Practitioner Carroll noted that Mr. Thrash was "very argumentative" and wanted the cyst removed. She explained that in her opinion this wasn't medically necessary, but told him to report any changes or new symptoms to medical staff.

Nurse Practitioner Carroll saw Mr. Thrash again on December 6, 2017. According to her notes, he first said he "didn't know why he was being seen & stated he didn't request to be called down." Nurse Practitioner Carroll asked him if he was

6

experiencing any issues, and he said he still had the cyst on his testicle. According to her notes, Mr. Thrash reported no changes to the cyst. They again discussed the ultrasound results and she reiterated that in her professional opinion no treatment was medically necessary at that time. As of the date of Mr. Thrash's deposition in June 2022, Mr. Thrash hadn't had the cyst removed.

Because Mr. Thrash was a pretrial detainee when these events occurred, his claim must be analyzed under the Fourteenth Amendment. Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018). "Pre-trial detainees cannot enjoy the full range of freedoms of unincarcerated persons." Tucker v. Randall, 948 F.2d 388, 390–391 (7th Cir. 1991) (citation omitted). Nevertheless, pretrial detainees are entitled to adequate medical care. Miranda v. Lake Cty., 900 F.3d at 353-354. To establish a violation of the right to adequate medical care, a pretrial detainee must show the following: "(1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's]s medical need; and (4) the defendant act[ed] purposefully, knowingly, or perhaps even recklessly with respect to the risk of harm." Gonzalez v. McHenry Cnty., Illinois, 40 F.4th 824, 828 (7th Cir. 2022) (citation and internal quotation marks omitted). In determining whether a challenged action is objectively unreasonable, the court must consider the "totality of facts and circumstances." Mays v. Dart, 974 F.3d 810, 819 (7th Cir. 2020). "[N]egligent conduct does not offend the Due Process Clause," and it's

7

not enough for the plaintiff "to show negligence or gross negligence." Miranda v. Lake Cty., 900 F.3d at 353-354.

No reasonable jury could conclude on this record that Nurse Sullivan violated the Fourteenth Amendment with respect to Mr. Thrash's medical care. To start with, it's not clear that Mr. Thrash had a serious medical need. His ultrasound revealed no significant abnormalities in his testicles other than a small cyst, which in Nurse Practitioner Carroll's professional opinion – the only expert opinion in the summary judgment record – didn't require treatment. He expresses concern that the cyst might have been "precancerous," but four years after these events he hadn't had the cyst removed, nor does he provide any evidence to show that it has worsened.[4]

Even if Mr. Thrash had a serious medical need, he hasn't pointed to evidence that Nurse Sullivan acted in an objectively reason fashion with respect to that need. She evaluated his symptoms several times, physically palpated his testicles, took his vital signs, promptly notified Nurse Practitioner Carroll of his symptoms, and followed the instructions she was given. Mr. Thrash believes that Nurse Sullivan acted unprofessionally and made the situation "uncomfortable" by implying that his complaints of testicular pain might have been sexually motivated. Nurse Sullivan disputes this, claiming that it was Mr. Thrash who made her feel uncomfortable. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v.

---

[4] Mr. Thrash acknowledged at his deposition that he hadn't sought treatment for this issue from the doctor at Indiana State Prison, where he has been incarcerated since 2018.

8

Liberty Lobby, 477 U.S. at 248. Regardless of whether Mr. Thrash or Nurse Sullivan made the situation "uncomfortable," the undisputed facts show that she palpated Mr. Thrash's genitals several times, took his vital signs, and reported his symptoms to Nurse Practitioner Carroll.[5] The record further reflects that Nurse Practitioner Carroll made her own evaluation of his condition, examining him in person more than once, reviewing the records compiled by Nurse Sullivan and the other nurses, viewing pictures of the affected area, ordering an ultrasound, and reviewing the results. Her professional opinion was that no medical treatment of the cyst was warranted.

There is no evidence in the record to suggest that Nurse Sullivan had the authority to prescribe pain medication or otherwise override Nurse Practitioner Carroll's treatment decisions. *See* Brown v. Osmundson, 38 F.4th 545, 553 (7th Cir. 2022) (no liability for prison nurse who "wrote down [the plaintiff's] symptoms, checked his vitals, relayed necessary information to [the doctor], and performed her assigned duties."); Reck v. Wexford Health Sources, Inc., 27 F.4th 473, 485 (7th Cir. 2022) ("As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions."). In certain limited circumstances, a nurse can be held liable for "blind or unthinking" adherence to a doctor's orders where an inmate is obviously being mistreated. *See* Reck v. Wexford Health, 27 F.4th at 485. This isn't such a case. Mr. Thrash's medical records show that he was seen and evaluated

---

[5] Mr. Thrash complains that at some point Nurse Sullivan told him not to worry about the lump, but that she may have tried to reassure him doesn't establish a constitutional violation. The medical records reflect that she didn't simply dismiss his problem and instead promptly reported his symptoms to Nurse Practitioner Carroll.

9

multiple times by nurses (including non-parties) and the jail's medical provider within a span of weeks. He was given a urinalysis test that was normal and underwent an ultrasound, which showed that his testes were normal other than the presence of a small cyst. Based on the record, no reasonable jury could conclude that it was objectively unreasonable for Nurse Sullivan to follow the instructions of Nurse Practitioner Carroll.

Mr. Thrash appears to dispute that Nurse Sullivan contacted Nurse Practitioner Carroll, at least after the first time she saw him for the testicular issue on September 19. He doesn't explain how he would have personal knowledge of what actions Nurse Sullivan took outside of his presence, and his speculation about what might have occurred isn't enough to defeat summary judgment. Trade Fin. Partners v. AAR, 573 F.3d at 407. The medical records reflect that Nurse Sullivan placed a telephone call to Nurse Practitioner Carroll on September 19. (ECF 34-4 at 9.) But even accepting Mr. Thrash's version, the record reflects that Nurse Practitioner Carroll personally reviewed Nurse Sullivan's notes a few days later, and then personally examined him less than a week after that. She ordered an ultrasound that revealed no significant abnormalities. Mr. Thrash hasn't pointed to evidence that Nurse Sullivan stood in the way of his treatment or otherwise acted in an objectively unreasonable fashion under the circumstances.

Mr. Thrash also argues that it was Nurse Sullivan who caused an undue delay in evaluation by Nurse Practitioner Carroll, but the record doesn't bear this out either. Instead, the record reflects that Nurse Sullivan first saw Mr. Thrash for this

10

issue on September 19, and saw him again on September 26. By the time Nurse Sullivan saw him the second time, another nurse had sent pictures of the affected area to Nurse Practitioner Carroll. Nurse Sullivan nevertheless contacted Nurse Practitioner Carroll again, and Nurse Practitioner Carroll said she would personally evaluate him at her next facility visit. Nurse Practitioner Carroll saw Mr. Thrash the next day and ordered an ultrasound that was promptly completed and showed no significant abnormalities. There is no evidence in this record to support an inference that Mr. Thrash experienced an objectively unreasonable delay in obtaining an evaluation by the Nurse Practitioner—let alone a delay caused by Nurse Sullivan— or that any delay he experienced caused him injury. *See* Stockton v. Milwaukee Cnty., 44 F.4th---, 2022 WL 3210359, at *5 (7th Cir. Aug. 9, 2022) (summary judgment is warranted where "a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury").

Mr. Thrash testified at his deposition that his family members contacted an unidentified doctor on an unspecified date and this doctor allegedly told his family members that the cyst should have been removed. Mr. Thrash didn't submit affidavits or sworn declarations from any of those people, however, and his own account of what these non-parties said is inadmissible hearsay. "Inadmissible hearsay evidence may not be considered on summary judgment." Eaton v. J. H. Findorff & Son, Inc., 1 F.4th 508, 512 n.3 (7th Cir. 2021). Even if the court were to presume this information to be true, at most it would show that medical professionals might have differing views on how to treat the small cyst. *See* Stockton v. Milwaukee County, 2022 WL 3210359, at

11

*5 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."). No evidence in this record allows a reasonable inference that Nurse Sullivan acted in an objectively unreasonable fashion by following the orders of the jail's medical provider, who was of the view that no treatment was necessary. Nurse Sullivan is entitled to summary judgment.

For these reasons, the court GRANTS the motion for summary judgment (ECF 33) and enters judgment in favor of Nurse Tracy Sullivan. The clerk is DIRECTED to close this case.

SO ORDERED on August 31, 2022

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT